**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

SUSAN G. HARRIS,               )
                               )
              Plaintiff,        )
                               )
       v.                      )        Civil Action No. 03-145J
                               )
CONCURRENT TECHNOLOGIES        )
CORPORATION EMPLOYEE BENEFIT   )
PLAN c/o CONCURRENT            )
TECHNOLOGIES CORPORATION       )
and UNUM LIFE INSURANCE        )
COMPANY OF AMERICA,            )
                               )
              Defendants.       )

## MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

### SYNOPSIS

This matter comes before the Court on UNUM Life Insurance Company of America's [hereinafter "Defendant" or "UNUM"] Motion for Summary Judgment (Document No. 30) and its Brief in Support (Document No. 31), which requests summary judgment as to the only count in the Complaint, and Susan Harris' [hereinafter "Plaintiff" or "Harris"] Brief in Opposition to Defendant's Motion for Summary Judgment (Document No. 37). Plaintiff's Complaint (Document No. 1) alleges breach of contract in violation of Plaintiff's rights under the Employee Retirement Income Security Act (hereinafter "ERISA"), 29 U.S.C. §1132(a)(1)(B). For the reasons stated herein, the Defendant's Motion is denied.

## JURISDICTION

Jurisdiction is proper in the United States District Court for the Western District of Pennsylvania pursuant to 28 U.S.C. §1331 based on federal question jurisdiction and 29 U.S.C. §1132(e)(1) based on ERISA.

## BACKGROUND[1]

### I.    MATERIAL FACTS NOT IN DISPUTE

The present breach of contract action [was brought by Susan G. Harris (hereinafter "Plaintiff" or "Harris")] under ERISA, 29 U.S.C.§1132(a)(1)(B), to recover long-term disability benefits allegedly due under an employee welfare benefit plan in which she was a participant by reason of her employment with Concurrent Technologies Corp. [(hereinafter "CTC")]. Plaintiff commenced this action in the Court of Common Pleas of Cambria County, Pennsylvania, against [CTC] and UNUM Life Insurance Company of America (hereinafter "Defendant" or "UNUM"), which insured [CTC's] short and long-term disability plans, as well as, its group life insurance plan. Defendants timely removed the action [] on the basis of federal question jurisdiction, 28 U.S.C.§1331. [Plaintiff settled her claim against CTC].

---

[1]These facts have been compiled in accordance with Local Rule 56.1. The facts as set forth in both parts are based upon the submissions of the parties of proposed statements of Material Facts Not in Dispute, objections thereto and counter-statements thereto. They are indented to indicate that they are direct quotations. Any fact not present in either of these parts has been deemed by the Court to be immaterial, disputed for purposes of the present motions or argumentative and not factual. Some facts may not be in the same form as submitted because the Court has concluded that the record did not support the fact as proposed.

2

[P]laintiff [] earn[ed] a bachelor's degree in Environmental Science in 1995 from Northern Arizona University. In September 1995, [P]laintiff began her employment with [CTC]. At the time of her disability, Plaintiff was working as an Environmental Assessment Specialist earning $37,500.00 per year. [P]laintiff was insured for both short-term and long-term disability under the plans issued to [CTC] by [Defendant]. [Defendant administered and funded both plans].

On December 4, 1999, [P]laintiff was involved in a serious non-work related auto accident. [Plaintiff suffered temporary paralysis, multiple vertebrae] fractures, a dislocated hip and various other injuries. Plaintiff was taken to Presbyterian University Hospital in Pittsburgh. On December 8, 1999, she was transferred to [the] Lee Hospital Rehabilitation Unit.

Fortunately, [P]laintiff was [initially] able to recover from her physical injuries and return [to work] in June 2000. There is no dispute [Plaintiff] was an eligible employee under the benefit plan at the time of the accident. [Plaintiff] was paid all applicable benefits under the [disability] plan [from December 1999] until her return to work in June 2000.

On December 20, 2000, [six months after Plaintiff's initial recovery and return to work,] Plaintiff visited the office of her primary care physician, Dr. Fred Munzer[.] [Plaintiff complained] of severe neck pain, migraine headaches, ulcerative colitis and increased anxiety. Dr. Munzer took her off work and prescribed a course of physical

3

therapy. [Although] Plaintiff was already taking Paxil to combat her anxiety,[2] Dr. Munzer increased the dosage from 20mg. to 40mg. daily.

Plaintiff received physical therapy treatments from January 15, 2001 through March 30, 2001. At the time of her final physical therapy visit, Plaintiff reported negligible symptoms and indicated that she was anxious to return to work. Defendant paid short-term disability benefits from December 19, 2000 until April 15, 2001.

According to [CTC], [P]laintiff work[ed] eight hours on April 24 and April 26 and did not work again until May 7, 2001. Plaintiff worked [full-time from May 7, 2001 until May 18, 2001].

In April 2001, [coinciding with the improvement of Plaintiff's physical symptoms, Plaintiff] suffered acute anxiety and depression with agoraphobic components in conjunction with her unsuccessful attempts to return to work. Plaintiff visited Dr. Munzer [regarding these conditions in May 2001.] [Dr. Munzer increased Plaintiff's Paxil dosage to 80 mg. and] decided to refer her to a psychiatrist. In a May 24, 2001 letter of introduction from Dr. Munzer to Dr. Linda Moran, who would become [P]laintiff's psychiatrist, Dr. Munzer stated [P]laintiff had fully recovered from her physical injuries, but had developed a recent fear of leaving her house [that he] characterized [] as agoraphobic presentation or possibly post-traumatic stress.

In an initial diagnostic interview on June 19, 2001, [P]laintiff's psychiatrist, Dr.

---

[2]Prior to the accident in December 1999, Plaintiff received a prescription for a low dosage of Paxil for mild anxiety and depression.

4

Linda Moran, diagnosed [Plaintiff with] panic disorder, severe, with agoraphobia and major depression. Dr. Moran kept her on Paxil 80 mg. per day previously prescribed by Dr. Munzer, and added Klinopin and Trazodone at bedtime to improve sleep.

As a result of her psychiatric condition, [P]laintiff again sought short-term disability benefits. On July 1, 2001, [P]laintiff submitted a disability claim to [Defendant] based on "severe anxiety, panic attacks, fear of leaving the house, social fear, fear of job, etc...."

Over the next several months [P]laintiff experienced a series of improvements and setbacks in her condition. In a progress note dated July 24, 2001, Dr. Moran indicated that [P]laintiff had suffered a few panic attacks, but was still suffering from agoraphobia. [P]laintiff also reported she was having difficulty spelling, writing and using words. In an attending physician statement dated July 24, 2001, Dr. Moran provided a diagnosis of panic disorder, severe, with agoraphobia. In response to a question [on the attending physician statement] concerning the severity of [P]laintiff's physical impairment, Dr. Moran [marked] N/A.

Dr. Munzer's notes indicate that [P]laintiff called his office on August 22, 2001 requesting a letter in support of her disability claim. On August 28, 2001, Dr. Munzer's office submitted a form to Defendant in which Dr. Munzer identified the nature of [P]laintiff's illness as "psychiatric," and noted that [P]laintiff had been advised to see Dr. Moran. Dr. Munzer wrote "Let Dr. Moran decide [the] length of disability as it is for psychiatric reason[s]."

5

On September 14, 2001, Dr. Moran completed a UNUM disability form. Dr. Moran stated that [P]laintiff suffered from "extreme and severe panic attacks and agoraphobia." Dr. Moran indicated that [P]laintiff could not function at work due to anxiety and that although she wanted to return to work eventually, she could not do so at this time.

On September 26, 2001, [P]laintiff was hospitalized after complaining of right and left sided weakness while in her doctor's office. [P]laintiff reported that she had stopped all of her psychotropic medications after discovering that she was pregnant.

On October 12, 2001, Dr. Moran submitted a response to UNUM's Mental Status Supplemental Questionnaire. Dr. Moran noted that [P]laintiff suffered severe impairment in her ability to perform daily activities and to perform under stress, and mild to moderately severe impairment in other areas of daily living.

In a medical review conducted by [Defendant] on October 17, 2001, [Defendant's] reviewer, Ann Marie Murphy, R.N., concluded that the information supported impairment for an additional 4-6 weeks. Ms. Murphy also recommended contacting [P]laintiff's employer and her treating psychiatrist regarding accommodations, including the possibility of working at home. Ms. Murphy commented that if no accommodations could be made and panic attacks continued, Plaintiff might not be able to return to work until the end of December.

On October 22, 2001, [P]laintiff visited her neonatologist, Dr. Robert Mucciola for a follow-up visit. At that time, Dr. Mucciola was unable to detect a fetal heartbeat,

6

and determined that [P]laintiff had suffered a miscarriage. [Plaintiff resumed her psychotropic medications following her miscarriage].

In a progress note dated November 2, 2001, Dr. Moran noted that [P]laintiff was doing quite well despite having suffered a miscarriage. Dr. Moran stated that [P]laintiff had been taking her psychotropic medications, and that she would not go off these again. Dr. Moran also mentioned that [P]laintiff appeared to be in a very good mood and very future-oriented.

On November 21, 2001, Dr. Moran wrote a letter to [Defendant] stating that [P]laintiff was still unable to return to work at this time as she continued to suffer with panic attacks, agoraphobia and post-traumatic stress. Dr. Moran also noted that [P]laintiff had difficulty writing and using words, and at times still avoided even going to the store without her mother's accompaniment. [Dr. Moran indicated that she prescribed rest from the workplace, psychotropic medications and continued psychotherapy for Plaintiff].

In an office note dated November 30, 2001, Dr. Moran noted that [P]laintiff "Looks wonderful," that she had been out shopping with her mother, had been talking to and e-mailing people regularly and had applied to school to become a radiology technician. [Dr. Moran noted that Plaintiff's friend was fired from CTC which was giving her the courage to tell CTC she was quitting]. Plaintiff also reported that she had gone to an auction by herself where she bid on items. Plaintiff reported that she could drive, although she avoided driving on major highways.

7

On November 29, 2001, [Defendant] approved short-term disability benefits [for Plaintiff's psychiatric conditions] through November 27, 2001, the maximum benefit period under the [short-term disability] plan, and transferred the claim to its [long-term disability] claims unit. Plaintiff was paid all of the short-term disability benefits to which she was entitled.

On or about January 15, 2002, [Defendant] requested and obtained office records from [P]laintiff's primary care physician, Dr. Munzer, from 1998 to the present. [Defendant] also obtained records from Dr. Moran from the beginning of treatment on June 19, 2001 to her most recent office visit on January 11, 2002. In addition, [Defendant] obtained records from [P]laintiff's obstetrician, Dr. Robert Mucciola. On January 31, 2002, [Defendant] obtained information from [CTC] concerning [P]laintiff's attendance, an occupational analysis and a job description.

Christine Land, the [Defendant's] representative assigned to handle [P]laintiff's long-term disability claim, spoke to [P]laintiff by telephone [on] December 10, 2001. Ms. Land thereafter ordered medical records from [P]laintiff's treatment providers and sought information from [P]laintiff's employer regarding [P]laintiff's attendance and job duties. After obtaining Dr. Moran's records from the inception of treatment on June 19, 2001 to the last office visit on January 11, 2002, Ms. Land submitted those records to [a senior clinical consultant on Defendant's staff], Paul C. Burgos, MA, ALHC for review.

8

Mr. Burgos reviewed the file on February 6, 2002, and concluded that the medical documentation did not support an impairment through the elimination period under the policy, which he erroneously calculated to run from June 19, 2001 through December 16, 2001.[3] Mr. Burgos discussed the claim with a [physician on Defendant's staff], Dr. Dominiak, who also noted that [P]laintiff appeared to be in significant remission even in the context of the loss of her pregnancy, and was no longer limited from returning to work as a result of her mental illness.

On February 13, 2002, [Defendant's] lead disability benefit specialist, Christine Land, notified Plaintiff that, based on a review of the medical information in her file, [Defendant] would be unable to approve her claim for [long-term disability] benefits. [Defendant] informed [Plaintiff] that its basis for denial of her claim was her failure to satisfy the elimination period under the [long-term disability plan], which she [] erroneously indicated ran from June 19, 2001 to December 15, 2001. [Defendant] noted that [P]laintiff's monthly care with Dr. Moran had aided in [P]laintiff's recovery and overall functioning. [Defendant] further asserted [P]laintiff appeared to be in significant remission, and no longer limited by mental illness from returning to work. [Defendant] did not ask any of [Plaintiff's] treating [doctor's] to comment directly on whether [she] remained disabled. Defendant did not request an Independent Medical Examination [as it was permitted to do under the terms of the long-term disability plan].

---

[3]Defendant designated the elimination period as May 19, 2001 to November 14, 2001.

9

[In response to Ms. Land's indication that Defendant could not approve Plaintiff's claim for long-term disability benefits based on the medical information in Plaintiff's file, Plaintiff forwarded her most recent physical therapy records to Defendant].[4]  On February 20, 2002, [Defendant] received copies of [P]laintiff's physical therapy records, including records pertaining to [P]laintiff's most recent physical therapy evaluation and treatment beginning December 12, 2001 through January 21, 2002.

On February 26, 2002, a UNUM nurse, Michelle G. Simonds, R.N. reviewed the physical therapy notes and a psychiatric treatment note dated May 30, 2001.  Ms. Simonds noted that as of March 2001, [P]laintiff was reporting negligible symptoms and was ready to return to work.  Nurse Simonds could not determine, from the information provided, what had changed to cause [P]laintiff to return to physical therapy in December 2001.

On February 27, 2002, Lead Customer Care Specialist Christine Land reviewed the additional information forwarded by [P]laintiff.  Based on the review of information provided by UPMC Lee Regional Physical Therapy..., Ms. Land notified [P]laintiff that the information was not sufficient to reverse [Defendant's] previous decision.

---

[4]The Court understands Plaintiff to be seeking long-term disability benefits from Defendant based on her psychiatric condition, not her physical condition that required physical therapy.  While Plaintiff did forward these records to Defendant who subsequently addressed the physical aspect of Plaintiff's condition, primarily, her neck pain that required physical therapy, Plaintiff makes no argument to the Court that the physical neck injury is the basis for her claim for long-term disability benefits that was denied.  Additionally, in a telephone call to Defendant, Plaintiff expressly stated that she was not seeking benefits based on the physical injury to her neck.  FULCL00623.

10

[Plaintiff appealed Defendant's denial of long-term disability benefits]. Senior appeals specialist John Schifano acknowledged receipt of Plaintiff's appeal on March 7, 2002.

In connection with the appeal, [Defendant] conducted medical reviews both from a physical and psychological perspective. Dr. William Strassberg, an orthopedic surgeon, reviewed [P]laintiff's physical therapy records on April 2, 2002 and concluded that [P]laintiff should avoid repetitive head and neck motion, prolonged positioning of the head and neck and heavy lifting. On April 22, 2002, Dr. Strassberg added [an addendum] that [P]laintiff's need to exercise her neck throughout the day could be satisfied by gentle movement as needed. A vocational consultant [employed by Defendant] concluded that [P]laintiff could perform her sedentary occupation within the parameters expressed by Dr. Strassberg.

[A psychologist on Defendant's staff,] Michelle Schwab, Ph.D., reviewed [P]laintiff's file, to determine whether Plaintiff's psychological condition predated May 7, 2001. Dr. Schwab noted that [P]laintiff had a history of anxiety dating back to December 1998. Dr. Schwab also noted that from February to May 2001, Plaintiff had in fact taken prescribed medications to control her anxiety.[5]

While the appeal was pending, Dr. Linda H. Moran, [Plaintiff's] principal treating physician attempted to contact [Defendant's] claim representative by phone to

---

[5]These dates are important to a pre-existing condition argument that Defendant alleges as a basis for denial of Plaintiff's appeal. Defendant's argument is addressed later in this Memorandum Opinion and Order.

11

explain her records, and to confirm that [Plaintiff] remained disabled. [Defendant did not] speak with Dr. Moran. On March 28, 2002, Dr. Moran wrote a letter to [Defendant's] representative...which [] stated that [Plaintiff] remained disabled, and specifically rejected the misinterpretation of her records which allegedly formed the basis for the original denial of the claim. Dr. Moran further stated that her notes about [P]laintiff's improvements did not indicate that [she was] no longer the victim of ongoing panic disorder with agoraphobia with significant symptoms of post-traumatic stress disorder.

Based on the results of [the in-house] medical reviews, on May 28, 2002, [Defendant] notified [P]laintiff that it was upholding its original denial. In his letter, [Defendant] lead appeals specialist, John Schifano, explained that because [P]laintiff had been released to return to work on April 16, 2001, but did not return to full-time status until May 7, 2001, her claim was subject to the pre-existing condition limitation in the policy. [The letter alleged that Plaintiff's effective date of coverage was May 7, 2001 because under Defendant's interpretation of its long-term disability plan Plaintiff lost coverage in April 2001]. [The letter stated that P]laintiff had taken medications for anxiety during the three months prior to May 7, 2001, thus, her disability was excluded from coverage because it arose within one year of the effective date of coverage. Mr. Schifano went on to state that [] the evidence also indicated that [P]laintiff's psychiatric condition had resolved to the point where, as of November 2001, it no longer precluded her from returning to work, thus, [she failed to meet the 180-day elimination period

12

under the long-term disability plan.  Finally, this letter did not address Dr. Moran's

March 28, 2002 letter regarding Plaintiff's ongoing disability].

## ANALYSIS

**II.     SUMMARY JUDGMENT STANDARD**

> Summary judgment is appropriate only when it is demonstrated that there is no genuine
> issue as to any material fact and the moving party is entitled to judgment as a matter of
> law. *Celotex Corp. v. Catrett*,  477 U.S. 317, 322-32, 106 S.Ct. 2548, 2552- 57, 91
> L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). An issue of material fact is genuine "if the
> evidence is such that a reasonable jury could return a verdict for the nonmoving party."
> *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d
> 202 (1986). In deciding a motion for summary judgment, all reasonable inferences must
> be drawn in favor of the non-movant. *Oritani [Sav. & Loan Ass'n v. Fidelity & Deposit
> Co.*, 989 F.2d 635, 638 (3d Cir. 1993)].

*Troy Chem. Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 125-126 (3d Cir. 1994).

> As to materiality, the substantive law will identify which facts are material. Only
> disputes over facts that might affect the outcome of the suit under the governing law will
> properly preclude the entry of summary judgment. Factual disputes that are irrelevant
> or unnecessary will not be counted. *See generally* 10A C. Wright, A. Miller, & M. Kane,
> Federal Practice and Procedure § 2725, pp. 93-95 (1983). This materiality inquiry is
> independent and separate from the question of the incorporation of the evidentiary
> standard into the summary judgment determination. That is, while the materiality
> determination rests on the substantive law, it is the substantive law's identification of
> which facts are critical and which facts are irrelevant that governs. Any proof or
> evidentiary requirements imposed by the substantive law are not germane to this inquiry,
> since materiality is only a criterion for categorizing factual disputes in their relation to
> the legal elements of the claim and not a criterion for evaluating the evidentiary
> underpinnings of those disputes.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986).

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Adickes [v. S.H. Kress & Co.*, 398 U.S. 144, 158-159, 90 S.Ct.1598, 1608-1609, 26 L.Ed. 142, 159-160 (1970)]. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial. *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-2514, 91 L.Ed.2d 202, 216 (1986).

## III. ERISA STANDARD OF REVIEW

The first step in evaluating a benefits claim under the Employee Retirement Income Security Act of 1974 (hereinafter "ERISA"), 29 U.S.C. §§ 1001 *et seq.*, is to determine the appropriate standard of review. A denial of ERISA plan benefits is reviewed under a *de novo* standard unless the plan administrator had discretion to determine beneficiary eligibility or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L.Ed.2d 80 (1989). Discretionary denials are reviewed under an arbitrary and capricious standard. *Id.* Under this standard, an administrator's decision must be affirmed unless it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Abnathya v. Hoffman-LaRoche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993). "This scope of review is narrow, and the court is not free to substitute its own judgment for that of the [administrator] in determining eligibility for plan benefits." *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 1997).

14

However, a heightened arbitrary and capricious standard of review applies when the plan administrator's decision was potentially affected by a conflict of interest. *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 378-79 (3d Cir. 2000). A conflict exists where the "impartiality of the administrator is called into question." *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 435 (3d Cir. 2001). The potential for prejudice can arise because of the structure of the plan itself or because the beneficiary has presented specific evidence of bias or bad faith. *Id.* at 435-36. The court may examine evidence outside of the administrative record to determine whether there is a conflict of interest. *See Pinto*, 214 F.3d at 395; *Doyle v. Nationwide Ins. Cos. & Affiliates Employee Health Care*, 240 F.Supp.2d 328, 336 (E.D. Pa. 2003).

The Third Circuit Court of Appeals specifically identified that a special danger of a conflict of interest that warrants applying a heightened standard of review arises when a plan is both funded and administered by an administrator outside of the employer company, such as an insurance company. *Pinto*, 214 F.3d at 388. In circumstances that warrant a heightened level of review, the court should use the sliding scale approach, examining each case on its facts to determine what level of review to apply; the greater the danger of a conflict of interest, the less deference the reviewing court should apply. *Id.* The Court should look not only at the result reached by the administrator and whether it is supported by reason, but also at the process by which the result was achieved. *Id.* at 393.

The Third Circuit suggested that the presence of certain procedural anomalies could cause a court to examine a decision at the less deferential end of the arbitrary and capricious range. *Id.* at 394. In *Pinto*, several procedural anomalies placed the case at the least deferential end of the sliding scale. First, the administrator reversed an earlier decision allowing Pinto's benefits without any new medical

15

evidence to support the reversal. *Id.* at 393-94. Second, the administrator selectively relied on self-serving evidence supporting a denial of benefits, but rejected contrary evidence supporting a continuation of benefits. *Id.* Finally, the administrator ignored its own staff's recommendation that benefits be continued. *Id.*

In the *sub judice*, it is undisputed that the long-term disability plan gave Defendant discretionary authority. The long-term disability plan provides:

> When making a benefit determination under the policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy. FULCL00589.

Thus, the arbitrary and capricious standard of review would normally apply to Defendant's decision to deny Plaintiff's benefits. However, Defendant both funds and administers the long-term disability plan in issue in this case. Therefore, a special danger of a conflict of interest exists that warrants applying a heightened arbitrary and capricious standard of review.

Many procedural anomalies are present in the case *sub judice*. First, Defendant's decision to deny Plaintiff's claim was at odds with its earlier decision granting short-term disability benefits for Plaintiff's psychiatric condition through November 27, 2001 since denial of long-term disability benefits was based on the theory that Plaintiff was not disabled during November 2001. Additionally, Defendant selectively relied on evidence that supported a denial of benefits while rejecting evidence that supported the granting of benefits. Defendant also relied on the opinions of in-house doctors who never examined Plaintiff and who did not thoroughly address the opinion of Dr. Moran, Plaintiff's psychiatrist. As a result, the Court finds that a heightened standard of review applies, and while not at

16

the furthest end of the sliding scale, it is toward the less deferential end of the sliding scale. *See Pinto*, 214 F.3d at 393-94 (holding procedural anomalies placed the case at the less deferential end of the sliding scale).

## IV.   DISCUSSION

### A.   Review of Defendant's Decision to Deny Plaintiff Long-Term Disability Benefits

The Court now reviews the Defendant's decision to deny Plaintiff's claim for benefits using a heightened arbitrary and capricious standard of review. In conducting its review, the Court looks to the "record as a whole," which "consists of that evidence that was before the [defendant] when [it] made the decision being reviewed." *Mitchell*, 113 F.3d at 440. Accordingly, the administrative record in this case will consist of all information that Plaintiff submitted to Defendant before May 28, 2002, the date of the denial of Plaintiff's appeal.[6]

### 1.   Defendant's Denial Based on Pre-Existing Condition Theory

Defendant cited, as one of two reasons for denying Plaintiff's appeal, that Plaintiff's condition was excluded from coverage because it was a pre-existing condition. The provisions of the long-term disability plan relevant to Defendant's interpretation of the plan to bar Plaintiff from coverage based on her disability as a pre-existing condition include the following:

1)   You have a pre-existing condition if:

---

[6]Plaintiff argues that Defendant is required to give deference to the social security determination of disability. Plaintiff's Brief, p. 12. Although there is case law supporting this argument if the determination was part of the record before the administrator when it reviewed the claim, the social security disability determination regarding Plaintiff was not made until September 24, 2002. Appendix in Support of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, (Document No. 38) Exhibit B. Therefore, Plaintiff's social security disability determination was not part of the administrative record available to the Defendant when it reviewed Plaintiff's claim, and thus, Defendant cannot be required to have given deference to it.

-you received medical treatment, medical advice, care or services, including diagnostic measures, or took prescribed drugs or medicines in the three months just prior to your effective date of coverage, and

-the disability begins in the first twelve months after your effective date of coverage. FULCL00578.

2)   Eligible Group: All employees in active employment. FULCL00596.

3)   Active Employment:

ACTIVE EMPLOYMENT means you are working for your Employer for earnings that are paid regularly and that you are performing the material and substantial duties of your regular occupation. You must be working at least the minimum number of hours as described under Eligible Group(s) in each plan. Your work site must be:

-your Employer's usual place of business;

-an alternative work site at the direction of your Employer; or

-a location to which your job requires you to travel.

Normal vacation is considered active employment.  Temporary and seasonal workers are excluded from coverage.  FULCL00567.

4)   Minimum Hours Requirement: Employees must be working at least 40 hours per week.  FULCL00596.

5)   Coverage under the policy ends on the earliest of ... the last day you are in active employment except as provided under the covered layoff or leave of absence provision. FULCL00596.

Defendant argues that Plaintiff was released to return to work on April 16, 2001 and her membership in the eligible group of employees ended on that date. Defendant's Brief, (Document No. 31) p. 12. Defendant argues that Plaintiff became a covered employee again on May 7, 2001 when she was able to work a full 40 hour week. Defendant's Brief, p.12. Defendant uses this reasoning to support its argument that Plaintiff's "renewed" coverage began May 7, 2001, thus, she was subject to a pre-existing condition exclusion period for the three months between February 7, 2001 and May 7, 2001. Defendant's Brief, pp. 12-13. Defendant then asserts that since Plaintiff was treated for her

18

psychiatric conditions between February 7, 2001 and May 7, 2001 such conditions are excluded from coverage under the long-term disability plan because her psychiatric conditions were pre-existing conditions. Defendant's Brief, pp. 12-13.

On the other hand, Plaintiff argues that the long-term disability plan is ambiguous because no provision expressly addresses whether or not employees absent from work due to a sickness, injury or disability will remain in the "eligible group," and thus, will remain covered under the long-term disability plan. Plaintiff's Brief, (Document No. 37) p. 17. Plaintiff also argues that the Family and Medical Leave Act (hereinafter "FMLA") provision in the long-term disability plan that states an employee out on FMLA leave will not be subject to "a new waiting period [or] a new pre-existing conditions exclusion" applies to her circumstances. Plaintiff's Brief, p. 19; FULCL00590. Plaintiff argues that her absence due to her psychiatric conditions constituted FMLA leave. Plaintiff's Brief, p. 18. Thus, Plaintiff argues that, even if she were otherwise subject to a new pre-existing condition period as Defendant argues, she would be protected from exclusion from coverage because the FMLA provision specifically provides that a new pre-existing condition period will not be applied upon the employee's return to work. Plaintiff's Brief, p. 18.

Under the arbitrary and capricious standard for reviewing an ERISA benefits denial, the review board's interpretation of the policy is entitled to deference unless it was contrary to the plain meaning of the plan. *See Epright v. Envt'l Res. Mgmt.*, 81 F.3d 335, 339 (3d Cir. 1996). Pursuant to Pennsylvania law, where the language of the insurance contract is clear and unambiguous, a court is required to give effect to that language. *Lexington Ins. Co. v. Western Penn. Hosp.*, 423 F.3d 318, 324 (2005) (citing *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. Super. Ct.

19

1999)). A court must find that the contractual terms are ambiguous if they are "reasonably susceptible to different constructions and capable of being understood in more than one sense." *Id.* (quoting *Hutchinson v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. Super. Ct. 1986). Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1257 (3d Cir. 1993). Furthermore, in interpreting insurance contracts, absurd or unreasonable interpretations which would evade the reasonable expectations of the insured are to be avoided. *Nationwide Mut. Ins. Co. v. Cosenza*, 258 F.3d 197, 208 (3d Cir. 2001); *Britamco Underwriters, Inc. v. Weiner*, 636 A.2d 649, 651 (Pa. Super. Ct. 1994) (citing *Dibble v. Security of Am. Ins. Co.*, 590 A.2d 352, 354 (Pa. Super. Ct. 1991). Finally, as discussed earlier, in a conflict of interest situation such as exists in the case *sub judice*, a heightened standard of review applies and, while not at the furthest end of the sliding scale, it is toward the less deferential end of the sliding scale. *See Pinto*, 214 F.3d at 394-95.

In addressing a motion for summary judgment the Court must view the evidence in the light most favorable to the non-movant and all reasonable inferences must be drawn in favor of the non-movant. *See Anderson*, 477 U.S. at 255; *Troy Chem. Corp.*, 37 F.3d at 125-26. Construing the evidence in the light most favorable to the Plaintiff and drawing all reasonable inferences in favor of the Plaintiff, the Court finds the long-term disability plan is ambiguous on the issue of whether an employee absent from work due to a sickness, injury or short-term disability remains a member of an "eligible group" entitled to continuing coverage under the plan, and thus, is not subject to a new pre-existing condition period upon return to work. The ambiguous terms of the plan must be interpreted in favor of the insured and in a manner that is congruent with the reasonable expectation of the insured.

20

*See Heasley*, 2 F.3d at 1257; *Nationwide Mut. Ins. Co.*, 258 F.3d 208. Interpreting the plan in this manner, the Court finds that a genuine issue of material fact exists regarding whether the pre-existing condition clause applies in these circumstances to exclude Plaintiff from eligibility for coverage for her psychiatric conditions. Additionally, the Court finds a genuine issue of material fact exists on the issue of whether Plaintiff was out on FMLA leave between April 23, 2001 and May 7, 2001 and is thereby protected from application of a new pre-existing condition period under the FMLA provision of the long-term disability plan. The Court, therefore, denies summary judgment on this issue.

### 2.    Denial Based on the 180-day Elimination Period

The Defendant used as a basis for denial of Plaintiff's claim for long-term disability benefits, both in the initial denial and in the denial of the appeal, that Plaintiff failed to meet the 180-day elimination period. Defendant's Brief, p. 14. Defendant argues this basis for denial of Plaintiff's claim was not arbitrary and capricious. Defendant's Brief, p. 17. Plaintiff, on the other hand, argues Defendant's denial on this basis was arbitrary and capricious. Plaintiff's Brief, p. 20.

The long-term disability plan requires that a claimant show he/she is disabled for 180 days prior to becoming eligible for long-term disability benefits. The applicable provision states:

> You must be continuously disabled through your **elimination period**. UNUM will treat your disability as continuous if your disability stops for 30 days or less during the elimination period. The days you are not disabled will not count toward your elimination period.
>
> Your elimination period is 180 days. FULCL00585.

Defendant based its finding that Plaintiff failed to meet the 180-day elimination period on Mr. Burgos and Dr. Dominiak's assessment of Dr. Moran's progress notes regarding her sessions with

21

Plaintiff. Defendant's Brief, pp. 16-17. Mr. Burgos and Dr. Dominiak determined, based on Dr. Moran's progress notes from November 2, 2001 and November 30, 2001, that Plaintiff had recovered from her disabling psychiatric conditions by November 2001. Defendant's Brief, pp. 16-17. Defendant designated May 19, 2001 through November 14, 2001 as the applicable 180-day elimination period. Defendant's Brief, p.14. Thus, Defendant argues that Plaintiff was not entitled to long-term disability benefits because she failed to meet the required 180-day elimination period, a prerequisite to entitlement to long-term disability benefits. Defendant's Brief, pp. 16-17.

In making this determination, however, Defendant's reviewers selectively relied on positive progress notes from Dr. Moran's sessions with Plaintiff while rejecting other progress notes, as well as, rejecting letters written by Dr. Moran to Defendant specifically addressing Plaintiff's disability and explaining that Plaintiff was still suffering from her disabling psychiatric conditions and was unable to return to work. *See Pinto*, 214 F.3d at 393-94 (stating selectively reviewing medical records was self-serving and might have been arbitrary and capricious, but holding genuine issues of material fact on the issue precluded summary judgment); *Fiorentino v. PNC Bank Corp. & Affiliates Long Term Disability Plan*, No. 03-3417, 2004 WL 1813221, at *10-11 (E.D. Pa. July 19, 2004) (holding selective review of medical evidence constituted arbitrary and capricious denial, however, because of inconsistences in the record summary judgment was denied). In particular, one letter from Dr. Moran to Defendant specifically stating Plaintiff remained disabled was dated November 21, 2001, precisely the time Defendant's in-house reviewers claim Plaintiff was in remission. Defendant in no way addresses, acknowledges or explains this letter or any of the other progress notes or letters that evidence Plaintiff's disabling psychiatric conditions were not in remission. *See Cohen v. Standard Ins. Co.*, 155 F. Supp.

22

2d 346, 353 (E.D. Pa. 2001) (stating use of non-treating physicians' opinions who did not even examine plaintiff is self-serving and should be viewed with a high degree of skepticism); *Holzschuh v. UNUM*, No. 02-1035, 2002 WL 1609983, at *6 (E.D. Pa. July 18, 2002) (stating it is a procedural anomaly when a treating physician writes a letter to the insurer specifically addressing the plaintiff's disability and the insurer dismisses it without directly addressing it). Furthermore, Defendant's denial of Plaintiff's claim based on the theory she was not disabled in November 2001 is directly at odds with Defendant's award of short-term disability benefits to Plaintiff through November 27, 2001. *See Holzschuh* at *7 (stating defendant's decision to deny plaintiff's claim using non-treating/examining nurses or physicians should be viewed with significant skepticism where it reverses an earlier decision to award plaintiff benefits).

Construing the evidence in the light most favorable to the non-movant the Court finds that, despite the arbitrary and capricious nature of some of Defendant's actions in reviewing Plaintiff's claim, the inconsistencies in the record, primarily within Dr. Moran's progress notes and between some of her progress notes and her letters to the Defendant, create a genuine issue of material fact regarding whether Plaintiff is excluded from coverage under the long-term disability plan for failure to meet the 180-day elimination period. As a result, the Court denies summary judgment on this issue.

## B.     The Two Year Limitation in the Long-Term Disability Plan for Mental Disability Coverage

Defendant argues that Plaintiff, if held to be entitled to long-term disability benefits, is limited to coverage for only two years pursuant to the terms of the long-term disability plan. Defendant's Brief, pp. 18-19. The applicable provision of the long-term disability plan reads:

Disabilities due to sickness or injury, which are primarily based on **self-reported**

23

**symptoms,** and disabilities due to **mental illness** have a limited pay period up to 24 months. FULCL00579.

First, Plaintiff argues Defendant should be estopped from applying the two-year limitation period based on a Second Circuit Court of Appeals case and an unpublished Eastern District of Pennsylvania case that hold an insurance company should be estopped from asserting an alternative exclusion if the one originally proferred is held capricious. Plaintiff's Brief, p. 23; *see Lauder v. First UNUM Life Ins. Co.*, 284 F.3d 375, 377-78 (2d Cir. 2002); *McLeod v. Hartford Life & Accident Ins. Co.*, No. 01-4295, 2004 WL 2203711, at *5-6 (E.D. Pa. September 27, 2004). The Second Circuit Court of Appeals pointed to concerns that allowing the assertion of an alternative exclusion if denial is deemed capricious would encourage "...plan administrators like UNUM [to] try the easiest and least expensive means of denying a claim while holding in reserve another, perhaps stronger, defense should the first one fail." *Lauder* at 382.

The *Lauder* case is not on point with the facts in the case *sub judice*. The provision limiting coverage for a mental illness is not an alternative exclusion that could have been asserted when Defendant originally denied Plaintiff's claim, but rather, would only have arisen if the claim was granted and sustained for two years. Therefore, the concern raised by the Second Circuit Court of Appeals in *Lauder* is not present in this case and will not work to estop Defendant from asserting this exclusion in accordance with the clear terms of the long-term disability plan if Defendant is held to be responsible for paying long-term disability benefits to Plaintiff at trial and it is held that Plaintiff's disability fell within the ambit of this provision for the duration of the applicable two year period.

However, Plaintiff also argues that she was diagnosed with mild traumatic brain injury during

24

the potentially applicable two-year period and that this diagnosis takes her disability outside of the purview of the provision limiting coverage for a mental disability to two years. Plaintiff's Brief, p. 24. Plaintiff provides evidence that in January 2003, during the two-year period between November 27, 2001, when Plaintiff's short-term disability was exhausted, and November 27, 2003, she was diagnosed with mild traumatic brain injury which was determined to be the cause of her psychiatric disabilities. Appendix in Support of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, Exhibit E. Plaintiff provides evidence demonstrating mild traumatic brain injury is a physical or neurological injury. Appendix in Support of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, Exhibit F.

The Court finds Plaintiff raises a genuine issue of material fact on the issue of whether the mild traumatic brain injury diagnosis, an alleged physical or neurological cause for the disability, during the two-year period when Defendant would have been administering her claim takes Plaintiff's disability outside the purview of the limiting provision related to mental illness disabilities. Thus, the Court denies summary judgment on this issue.

## CONCLUSION

In conclusion, the Court finds a genuine issue of material fact exists regarding whether Defendant's denial of Plaintiff's claim for long-term disability benefits based on a pre-existing condition was arbitrary and capricious. Additionally, the Court finds a genuine issue of material fact exists regarding whether Plaintiff was excluded from coverage under the long-term disability plan based on failure to meet the 180-day elimination period. Finally, the Court finds a genuine issue of material fact exists regarding whether, if Plaintiff's claim was improperly denied, she would only be

25

entitled to coverage for two years under the provision limiting coverage for mental illness disability.

Therefore, the Court denies Defendant's Motion for Summary Judgment.

An appropriate order follows.

      **AND NOW**, this 30th day of March, 2006, this matter coming before the Court on the Defendant's Motion for Summary Judgment (Document No. 30), IT IS HEREBY ORDERED THAT the Defendant's Motion is DENIED.

      A separate scheduling Order will issue as to the date of trial.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**